**Patricia MURRAY, Plaintiff–Appellant,**

v.

**NEW YORK UNIVERSITY COLLEGE OF DENTISTRY, Defendant–Appellee.**

**No. 1451, Docket 94–9085.**

United States Court of Appeals, Second Circuit.

Argued April 14, 1995.

Decided June 16, 1995.

Debra L. Raskin, New York City (Anne L. Clark, Vladeck, Waldman, Elias & Engelhard, on the brief), for plaintiff-appellant.

Ada Meloy, New York City (S. Andrew Schaffer, on the brief), for defendant-appellee.

Arnold & Porter, New York City (Peter L. Zimroth, Deborah Goldberg, Julie Goldscheid, Deborah A. Ellis, NOW Legal Defense and Educ. Fund, of counsel), filed a brief for amicus curiae NOW Legal Defense and Educ. Fund in support of appellant.

McGuire, Kehl & Nealon, New York City (Terri E. Simon, Shelley Sanders Kehl, Jeffrey A. Kehl, of counsel), filed a brief for amici curiae Albany Medical College, Alfred University, American Ass'n of Dental Schools, Ass'n of American Medical Colleges, Brown University, The Trustees of Columbia University in the City of New York, The Johns Hopkins University, Manhattan College, Mount Sinai School of Medicine of the City University of New York, The New School for Social Research, Pace University, Rochester Institute of Technology, Rutgers, the State University of New Jersey, St. Francis College (NY), St. John Fisher College, Teachers College, The University of Notre Dame du Lac, and Yeshiva University, in support of appellee.

Before: FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Patricia Murray appeals from a judgment of the United States District Court for the Southern District of New York, Lawrence M. McKenna, *Judge,* dismissing her claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–1688 (1988) ("Title IX"), for gender discrimination based on sexual harassment. The district court dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the principal ground that it failed to allege sufficient facts to support a finding that defendant New York University College of Dentistry ("NYU" or the "College") either (1) had notice of the alleged sexual harassment prior to its cessation, or (2) retaliated against Murray after she informed NYU that the harassment had occurred. On appeal, Murray contends that the complaint sufficiently alleged the necessary elements of a "hostile environment" gender-discrimination claim under Title IX. For the reasons that follow, we reject her contentions and affirm the judgment of the district court.

## I. BACKGROUND

After successfully completing the first-year dental curriculum at NYU, Murray commenced the second-year course of study, which included participation in a dental clinic providing services to the public, in August 1992. Taking all of the allegations in the complaint as true, the subsequent events were as follows.

A. *The Alleged Sexual Harassment*

In September or October 1992, a patient in the clinic, Mitchell Davidson, began to harass Murray, initially by staring at her, commenting on her appearance, and asking her for dates. In late October or early November 1992, another dental student, identified in the complaint only as "Fabiola," told the chief of the dental clinic, Dr. Esther Kuyinu, that Davidson was "unstable" and that he was "sexually harassing" Murray. (Complaint ¶ 10.) In response to Fabiola's report, Kuy-

inu warned Davidson to cease his offensive behavior. Despite this reprimand, Davidson continued to importune Murray for dates and to make professions of love to her; he also began to stalk Murray, following her both at the clinic and in other parts of the College and outside of NYU. On several occasions, he followed Murray to a friend's apartment and waited outside for her. In an effort to avoid Davidson, Murray began to enter the clinic through a back door, use the stairways rather than the elevators, and alter her routes to and from the clinic. Kuyinu made no further inquiry about Davidson's conduct and took no action to ensure that it had stopped.

In March 1993, while receiving treatment at the clinic within view of where Murray was treating another patient, Davidson began "staring at Murray and trying to get her attention." (Complaint ¶ 12.) Murray was "distracted" and sought help from faculty member Dr. Ira Gulker, the first doctor she could find. Gulker told Murray "that he did not want to hear about her problem with Davidson and that she should 'grow up' and deal with it herself." (*Id.*) Davidson's conduct continued throughout Murray's second year and became "so persistent, open and notorious that numerous other students at the College were aware of his behavior and teased Murray about her 'boyfriend.'" (*Id.* ¶ 13.) The harassment finally ended in the early summer of 1993.

Of the 28 courses in the regular second-year curriculum at the College, Murray passed 18, received a grade of incomplete in four, and failed six. In September 1993, Murray received a letter from Associate Dean for Academic Affairs Frederick G. More, informing her that, based on this performance, the Academic Standing Committee at the College (the "Academic Committee" or "Committee") had recommended that Murray be required to repeat the second-year curriculum. Murray had already commenced her third-year courses and had made informal arrangements with individual instructors to rectify the deficiencies in her second-year record. The letter stated that if Murray wished to appeal the decision, she should contact More.

In October 1993, Murray met with More concerning her academic standing. At the meeting, Murray described Davidson's conduct, told More she had informed a faculty doctor (meaning Gulker) about Davidson's behavior, and explained that the harassment had adversely affected her performance during the previous academic year. More did not ask Murray to provide him with the names of her harasser or the doctor to whom she had complained. More reviewed a draft explanatory letter Murray had prepared and informed her that she could attend the meeting of the Academic Committee at which the Committee's initial recommendation would again be considered.

Prior to appearing before the Committee, Murray sent More the final version of her letter, dated October 20, 1993, requesting that the College allow her to continue with the third-year curriculum while she corrected the deficiencies in her second-year academic record, and pointing to "several extenuating circumstances" that had contributed to her poor academic results, (Murray Letter dated October 20, 1993, at 1). The letter first asserted that "[d]ue to a serious illness in my family, I was saddled with a great emotional burden. During this most stressful time, I was not able to give my school work the full attention it deserved." (*Id.* at 2.) She added that her financial situation required her to work part-time, which further limited the amount of time she could devote to her studies. The letter then described Davidson's harassment at length:

Another situation I was presented with, is difficult for me to discuss, but I feel it is important that I bring it to your attention. Last year ... a patient, although not assigned to me, began to sexually harass me. At first, he repeatedly told me that he found me attractive and that he wanted to date me. I immediately told him I was not interested and discouraged any further comments and overtures. However, he persisted and began following me around the school and surrounding neighborhood. This was brought to the Clinic Chief's attention and the patient was warned against future harassment. This did not stop him. In fact, his conduct became worse. The harassment and comments became more explicit and frightening. On several occasions he followed me to a classmate's apartment nearby school and waited for me outside the apartment building. As I hope you can imagine, this person's behavior was extremely frightening and distracting while I was at school. I became afraid to go into the clinic and even the Dental Center itself. This situation even affected my life outside of school causing me to spend sleepless nights worrying about what this person would do next. I did not know what to do or who [*sic*] to turn to. I hesitated to secure help from either school or outside officials, out of fear of what this obviously disturbed person might do. I realize now that this may have been an error in judgment, but I feel that my judgment was clouded by shear [*sic*] terror.

(*Id.*) Murray asserted that the harassment had detracted from her academic performance during the previous year, but that "the situation has improved. . . ." (*Id.*)

On October 22, Murray appeared before the Academic Committee, of which Gulker was a member. Although Murray was permitted to address the Committee concerning the reasons for her second-year academic results, the members did not ask her any questions about the sexual harassment or its impact on her performance. Following the meeting, Murray sent a second letter to More, stating that she had already corrected most of her deficient grades, reiterating her request not to repeat the second-year curriculum, and stating that she could rectify the remaining deficiencies in her record with "only a minimal amount of work." (Murray Letter dated October 25, 1993, at 1.) Murray further noted that, already having borrowed more than $117,000 to finance her dental school education, she would be unable to obtain sufficient funding to finance an extra year of studies.

Around the same time, Murray also lodged a complaint concerning the harassment with the Equal Employment Opportunity ("EEO") office at the College. None of the College officials who knew of Davidson's sexually harassing behavior had told Murray about the

existence of such an office. The EEO office took no action concerning her complaint.

In November 1993, the Executive Faculty approved the Committee's final recommendation that Murray be required to repeat her second year, rather than simply retaking the final examinations in her unsuccessful second-year courses. Murray has not attended classes at the College since being informed of the Executive Faculty's decision.

### B. *The District Court Proceedings*

In December 1993, Murray commenced the present action, alleging that NYU discriminated against her in violation of Title IX by (1) allowing the discriminatorily abusive environment created by Davidson to persist after the College had notice of it, and (2) retaliating against her for asserting her right under Title IX to be free from discrimination on the basis of gender. A third claim alleged that NYU had breached its state-law duty to maintain safe premises at the College. In lieu of answering, NYU moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6).

By Memorandum and Order dated September 29, 1994 ("District Court Opinion"), the district court granted NYU's motion. Noting that the legal standard for evaluating hostile-environment claims brought by students under Title IX was unclear, and that Murray contended that the notice standards of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e–17 (1988 & Supp. V 1993), applicable to employment discrimination cases, should be applied, the court held that the complaint failed to state a viable claim of gender discrimination under either standard. The court concluded that the facts alleged in the complaint would not support a finding either (1) that NYU had notice of ongoing harassment sufficiently severe and pervasive to give rise to a "hostile environment" under Title VII standards or (2) that after receiving notice that harassment had occurred, the College took any action disadvantageous to Murray from which an inference of discriminatory retaliation could be drawn.

With respect to the notice issue, the district court held, *inter alia*, that, since Davidson was not an agent of NYU or an NYU employee with supervisory authority over Murray, his conduct could not be imputed to the College unless an NYU official or agent had notice that Murray was being subjected to a hostile environment and failed to take appropriate corrective action. The court noted that when complaint was made to Kuyinu, Kuyinu promptly responded by admonishing Davidson to stop harassing Murray. The court stated that since Murray did not allege that she or anyone else thereafter informed Kuyinu that Davidson's offensive conduct had continued, Kuyinu could reasonably have inferred that the warning had been effective, and that the initial complaint to Kuyinu could not be considered to constitute notice that the harassment continued thereafter. As to the incident involving Gulker, the court noted that Murray did not allege that she told Gulker either of the sexual nature of Davidson's behavior or that this was repeated behavior. The court stated that "other than the solitary remark to Dr. Gulker, Murray fails to allege that she made any complaint during this period to school administrators, to NYU's Equal Opportunity office, to police, or to anyone who might resolve her problem." District Court Opinion at 7. The court found that the complaint indicated that NYU did not receive notice of the harassment until Murray's October 1993 meeting with More, *i.e.*, after she was informed of the Academic Committee's recommendation that she repeat her second year, and several months after the harassing conduct was alleged to have ceased. The court concluded that even if NYU might otherwise be held responsible for harassment by a clinic patient, it could not be held liable for "a situation that Murray failed to bring to its attention." *Id.*

The court also dismissed Murray's retaliation claim, noting, *inter alia*, that the Committee's September 1993 recommendation that Murray be required to repeat the second-year curriculum preceded NYU's receipt in October of notice of the harassment. The only actions taken by NYU after receiving notice of Davidson's conduct were the Committee's final decision affirming its earlier recommendation and the Executive Faculty's subsequent ratification of that decision. The

court stated that "[i]t cannot be argued that [these actions] constituted a *further* disadvantageous action" supporting an inference of discriminatory retaliation. *Id.* at 10 (emphasis in original). In addition, the court concluded that, since Murray did not allege that the College either exceeded its authority in imposing the requirement or selectively enforced the academic standards applied in Murray's case, "Murray's allegation of a causal connection between the actions of the Committee and her complaints of Title IX violations is purely speculative." District Court Opinion at 10.

The district court declined to exercise jurisdiction over Murray's state-law claim and dismissed the complaint in its entirety. This appeal followed.

## II. DISCUSSION

On appeal, Murray contends that the facts alleged in the complaint are sufficient to support reasonable inferences (1) that the College had contemporaneous notice, actual. and constructive, that Murray was being subjected to a hostile environment, and (2) that it required Murray to repeat her second-year course work in retaliation for her complaints about the harassment. We agree with the district court's conclusion that the complaint failed to state a claim on which relief can be granted.

### A. *The Notice Requirement*

■ Title IX proscribes discrimination on the basis of gender in educational programs and activities receiving federal financial assistance:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a). Title IX has been construed to prohibit gender discrimination against both students enrolled in federally supported educational programs and employees involved in such programs. *See North Haven Board of Education v. Bell,* 456 U.S. 512, 520–34, 102 S.Ct. 1912, 1917–25, 72

L.Ed.2d 299 (1982). An aggrieved individual has an implied right of action, *see Cannon v. University of Chicago,* 441 U.S. 677, 688–89, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979), for injunctive relief or monetary damages, *see Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 71–73, 112 S.Ct. 1028, 1035–37, 117 L.Ed.2d 208 (1992).

In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have generally adopted the same legal standards that are applied to such claims under Title VII. *See, e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 896–98 (1st Cir.1988) (harassment); *Preston v. Commonwealth of Virginia ex rel. New River Community College,* 31 F.3d 203, 206 (4th Cir. 1994) (retaliation). *See also Roberts v. Colorado State Board of Agriculture,* 998 F.2d 824, 832 (10th Cir.) (Title VII provides "the most appropriate analogue when defining Title IX's substantive standards") (internal quotes omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993). This Court too has looked primarily to Title VII, as well as to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d to 2000d-7 (1988) (prohibiting racial discrimination in federally supported educational programs), in defining the contours of a student's private right of action under Title IX for gender discrimination occurring in college disciplinary proceedings. *See Yusuf v. Vassar College,* 35 F.3d 709, 714–15 (2d Cir.1994).

Whether Title VII standards should also be applied in determining a Title IX sexual harassment claim by a student has not been directly addressed. However, the Supreme Court, in holding that Title IX authorizes awards of compensatory damages to Title IX plaintiffs generally, has invoked Title VII authority and principles. *See Franklin v. Gwinnett County Public Schools,* 503 U.S. at 73, 112 S.Ct. at 1036–37. *Franklin* involved a high-school student's allegations that she had been sexually harassed and assaulted by a teacher and that school officials with actual knowledge of the teacher's misconduct had failed to intervene. *See id.* at 64–65, 112 S.Ct. at 1031–1032. In rejecting the argument that the specific language of Title IX

did not give educational institutions sufficient notice of their liability for damages for such intentional discrimination, the *Franklin* Court stated:

> Unquestionably, Title IX placed on [such institutions] the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav[ings] Bank, FSB v. Vinson*, 477 U.S. 57, 64 [106 S.Ct. 2399, 2404, 91 L.Ed.2d 49] (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe.

503 U.S. at 75, 112 S.Ct. at 1037. The Court's citation of *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), a Title VII case, in support of *Franklin's* central holding indicates that, in a Title IX suit for gender discrimination based on sexual harassment of a student, an educational institution may be held liable under standards similar to those applied in cases under Title VII.

▮ An employee plaintiff suing under Title VII may state a claim of discriminatory harassment based upon a hostile work environment by alleging (1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, *see Harris v. Forklift Systems, Inc.*, — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. at 65–67, 106 S.Ct. at 2404–2406, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer, *see Karibian v. Columbia University*, 14 F.3d 773, 779 (2d Cir.) ("*Karibian*"), *cert. denied*, — U.S. —, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994); *Kotcher v. Rosa & Sullivan Appliance Center*, 957 F.2d 59, 62 (2d Cir.1992) ("*Kotcher*"). Whether the harassing conduct of a supervisor or coworker should be imputed to the employer is determined in accordance with common-law principles of agency. *See Meritor Savings Bank,*

*FSB v. Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408; *Karibian*, 14 F.3d at 779. Thus, when a supervisor wields the authority delegated to him by an employer either (a) to condition "tangible job benefits" affecting an employee on the employee's acceptance or rejection of the supervisor's sexual demands, *id.* at 778, or (b) to further the creation of a discriminatorily abusive work environment, the supervisor's conduct is deemed to be that of the employer, and the employer's liability for that conduct is absolute, *see id.* at 780. In contrast, employer liability for a hostile environment created by coworkers, or by a low-level supervisor who does not rely on his supervisory authority in carrying out the harassment, attaches only when the employer has "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher*, 957 F.2d at 63; *accord Karibian*, 14 F.3d at 780. An employer who has notice of a discriminatorily abusive environment in the workplace has a duty to take reasonable steps to eliminate it. *See Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986) (hostile racial environment).

Despite our statement in *Kotcher*, also quoted in *Karibian*, that an employer must "know" of the harassment, both the Equal Employment Opportunity Commission Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604 (1993), and decisions in other circuits indicate that under Title VII an employer has notice of sexual harassment committed by coworkers "where the employer (or its agents or supervisory employees)" knew "*or should have known* of the conduct." 29 C.F.R. § 1604.11(d) (emphasis added); *see also Nichols v. Frank*, 42 F.3d 503, 508 (9th Cir.1994) ("The proper analysis for employer liability in hostile environment cases is what management-level employees knew or should have known. . . ."); *Pierce v. Commonwealth Life Insurance Co.*, 40 F.3d 796, 803–04 (6th Cir.1994) (endorsing constructive-notice standard in coworker harassment cases); *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1345–46 (10th Cir.1990) (affirming judgment against employer based on district court's finding that employer had actual or constructive notice); *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1015–16 (8th Cir.1988) (holding that

even if employer lacked actual knowledge, it would have been liable for hostile environment based on constructive knowledge). The same standard has been adopted by the EEOC in determining whether an educational institution has notice of a hostile racial environment under Title VI. *See* Investigative Guidance, Racial Incidents and Harassment Against Students at Educational Institutions, 59 Fed.Reg. 11448, 11450 (1994) (educational institution "is charged with constructive notice of a hostile [racial] environment if, upon reasonably diligent inquiry in the exercise of reasonable care, it should have known of the discrimination").

Murray argues that this standard of constructive notice should be extended, in Title VII cases, to circumstances in which the hostile environment is created by a third party who is not an employee, and she urges that an analogous standard be applied to harassment by third parties under Title IX. *Cf.* 29 C.F.R. § 1604.11(e) (non-binding EEOC guideline extending Title VII constructive-notice standard to hostile work environment caused by "acts of non-employees"); *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982) (dictum suggesting extension of constructive-notice standard to non-employees in Title VII hostile-environment cases). We think it unnecessary to decide here to what extent we would apply a constructive-notice standard in cases under either Title VII or Title IX, however; for we conclude that, even assuming a broad application of that standard, and drawing all reasonable inferences in Murray's favor, the complaint fails to allege that even NYU's agents knew or should have known of the continued harassment in the present case.

■ Murray points to only two incidents that she contends gave NYU actual or constructive notice of the harassment prior to its termination in the summer of 1993: (1) Fabiola's complaint to Kuyinu in late October or early November 1992 that Davidson was sexually harassing Murray, and (2) Murray's request for assistance from Gulker after Davidson stared at her and "tr[ied] to get her attention" from across a hallway in the dental clinic in March 1993. Neither of these can support a reasonable inference that NYU had the requisite notice.

Although the complaint alleges that Fabiola told Kuyinu that Murray was being "sexually harass[ed]," and Kuyinu did not follow up her initial reprimand of Davidson by inquiring whether the harassing conduct had in fact continued, the complaint concedes that Kuyinu admonished Davidson to stop. Assuming that Davidson's alleged conduct at the time of Fabiola's complaint, consisting of stares, general "comments" on Murray's appearance, and requests for dates, was sufficiently severe and pervasive to give rise to a discriminatory hostile environment, we see no error in the district court's conclusion that Kuyinu's response as alleged in the complaint was sufficiently calculated to end the harassment. Without an allegation that Kuyinu was ever informed that her admonition had not been heeded, there can be no inference that Kuyinu, and thereby NYU, had any notice that the harassment continued.

With regard to Murray's request for help from Gulker, the complaint does not allege that Davidson's conduct in the incident that immediately prompted that request, *i.e.,* that he was staring at Murray and trying to get her attention, was of an ongoing sexually offensive nature. Though Murray must have viewed it as having sexual overtones in light of Davidson's past behavior, the complaint does not suggest that she informed Gulker of its sexual connotations or that Davidson's misbehavior was part of that ongoing course of harassment. In light of the absence of such allegations, there is no reasonable basis for the inference that NYU, through Gulker, had either actual or constructive notice of that ongoing harassment.

Nor is there any merit to Murray's further contention that Davidson's harassment was so persistent and became so widely known at the College that NYU must have known, or in the exercise of reasonable care should have known, that Murray was subject to a discriminatorily abusive environment at the dental clinic. The complaint's allegations that "numerous" other NYU dental students knew of Davidson's misconduct, and that these students "teased" Murray about her " 'boyfriend,' " do not support the inference

that any agent of NYU was also aware of the harassment. Indeed, the allegation that Murray's fellow students made light of Davidson's conduct undercuts such an inference by suggesting that even these students were unaware that Davidson's conduct was offensive and abusive. Murray's own statement in her October 20, 1993 letter that she "hesitated to secure help from either school or outside officials" is also consistent with the absence of sufficient factual allegations in the complaint to support the imputation of notice to NYU.

Finally, Murray asserts that NYU failed to remedy the hostile environment after she gave explicit notice of the harassment to More in October 1993. This assertion provides no basis for relief because the complaint alleged that the sexual harassment had ended in the early summer of 1993.

We see no indication in the record that Murray could point to any other event that would have put NYU on notice that she was suffering sexual harassment by Davidson. She apparently made no request for leave to amend her complaint to add to its allegations. We conclude that the district court properly dismissed the complaint for failure to state a claim on which relief can be granted.

B. *The Retaliation Claim*

■ The district court also properly dismissed Murray's claim that NYU retaliated against her for asserting her rights under Title IX. To allege a prima facie case of discriminatory retaliation under Title VII, a plaintiff must allege facts showing, *inter alia,* (1) that the employer took adverse action against the plaintiff after becoming aware of her protected conduct, and (2) that "a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993). We have noted that in order to make out a Title IX claim based on an educational institution's allegedly discriminatory motivation in taking disciplinary action against a student, the complaint must set forth a "particularized allegation relating to a causal connection between the flawed outcome and gender bias" and must point to "particular cir-

cumstances" supporting an inference of gender bias, such as "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf v. Vassar College,* 35 F.3d at 715. No lesser showing is necessary when the educational institution's challenged action is not disciplinary but is rather an enforcement of its facially neutral academic standards.

■ The factual allegations supporting Murray's retaliation claim plainly fail to satisfy these requirements. The complaint makes no allegation either that NYU selectively enforced its academic standards, or that the decision in Murray's case was inconsistent with those standards. Most significantly, the Academic Standing Committee's recommendation that Murray be required to repeat her second year's studies, citing her failure to complete satisfactorily 10 of her 28 courses, was made prior to Murray's informing the College of Davidson's continued sexual harassment. Without more, an allegation that the Committee's decision was not altered when Murray thereafter introduced the claim of sexual harassment as one cause of her academic failings is insufficient as a matter of law to support an inference of discriminatory motivation.

## CONCLUSION

We have considered all of Murray's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.