**Lillian N. EDWARDS, Plaintiff,**

v.

**STATE OF CONNECTICUT DEPARTMENT OF TRANSPORTATION, Defendant.**

**No. 3:97CV01046(GLG).**

United States District Court, D. Connecticut.

Sept. 17, 1998.

Maureen Murphy, Greenfield & Murphy, New Haven, CT, for Plaintiff, Lillian N. Edwards.

Richard Blumenthal, Attorney General, Anthony Jannotta, Assistant Attorney General, Hartford, CT, for Defendant, State of Connecticut Department of Transportation.

## OPINION

GOETTEL, District Judge.

In this employment discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the plaintiff, Lillian N. Edwards, an African–American female, alleges that she was discriminated against in the terms and conditions of her employment and that she was subjected to a hostile work environment because of her race and gender by the defendant, the State Department of Transportation ("DOT"). DOT has moved for summary judgment on the grounds that the plaintiff's allegations of harassment do not, as a matter of law, establish the existence of a hostile work environment or, alternatively, that DOT cannot be held liable for that conduct.

For the reasons set forth below, we DENY the Defendant's Motion for Summary Judgment.

### Summary Judgment Standard

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there are any genuine issues of material fact, the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997) (citations omitted).

Additionally, the Second Circuit has held that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case. *Gallo v. Prudential Residential Services Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *Id.*

We present herein the facts in the light most favorable to the plaintiff.

### Facts

The plaintiff began working for DOT in January of 1989 as a Maintainer I, where her duties included working on the highways and maintaining the roads. From January 1989 until July 1990, the plaintiff was assigned to a DOT garage in Wallingford, Connecticut, where she was the only female Maintainer I who performed road work. Her supervisor was Eli Rascati, the General Supervisor, who was in charge of the entire crew assigned to the garage.

During the plaintiff's assignment to the Wallingford garage, she claims that she received differential treatment from Rascati in the assignment of tasks and in her ability to take time off, which she attributes to her gender. The plaintiff, however, did not complain to Rascati, allegedly because she was relatively new at the job, she was working in a male-dominated field, and she wanted to prove herself and not be regarded as a complainer. Rather than filing a complaint of gender discrimination, she requested a transfer to the North Haven garage.

In July 1990, she transferred to North Haven and again was the only female working on the roads. She alleges that, after transferring to North Haven, she realized that this garage included a number of white men who had been with DOT for a number of years and who had a reputation for drinking on the job and intimidating minorities. This group included Joe Tricarico, a white male, who appeared to plaintiff to be the designated leader. Tricarico was plaintiff's co-worker.[1]

Shortly after the plaintiff's transfer, Rascati was also transferred to North Haven and became her supervisor once again. Rascati was aware of Tricarico's reputation for causing trouble and taking control, so much so, that upon arriving at the garage, Rascati took him "for a ride" to discuss things.

Once the plaintiff was under Rascati's supervision, she again experienced differential treatment regarding assignments, such as having to clean toilets, an assignment allegedly not given to men, not being given overtime calls, and not being allowed to take time off. She began to complain to Rascati about the differential treatment that minorities were receiving, such as having to clean up around the garage, pick up litter, and clean the vehicles, that the other workers were not asked to do. She states that he ignored her complaints.

From October 1991 until January 1992, the plaintiff was on a layoff from her job. She states that she returned to work in January 1992, determined to stand up for herself against the discrimination.

On or about January 17, 1992, her co-worker Tricarico stated to another co-worker, who is African–American, words to the effect that the plaintiff could not work as fast or as hard as a male and that DOT should not hire "girls" for roadwork. On the same day, Tricarico referred to an African–American co-worker as "boy" in the presence of plaintiff and told her that she could not do the work because she was a "girl." On that day, she claims that she stood up for herself

---

1. Tricarico was a Qualified Craft Worker. In Rascati's deposition, which has been offered by both parties, Rascati states that Tricarico was a co-worker of the Maintainers and not a supervisor, although because of his job classification, he could have acted as a supervisor of a crew. Rascati 3/30/98 depo. at 99–100. The plaintiff describes him as a "co-worker". Furthermore, she never alleges that he was her supervisor or that he had supervisory authority over her. Thus, we will treat him as a co-worker, which becomes significant on the issue of DOT's liability for the alleged hostile environment, discussed *infra*.

to Tricarico. At the end of the day, however, she found that the tire on her car was flat, and it is her belief that it had been vandalized. She reported this to her supervisor, Rascati, but according to the plaintiff, he did not appear to take her concerns seriously and did nothing to investigate the incident.[2]

Approximately two days later, the plaintiff had another run-in with Tricarico. He harassed her about being female. She states that she stood up for herself and, again, found one of her tires vandalized. She reported this second incident to Rascati, who again did nothing, according to the plaintiff.[3]

Two days later, on January 21, 1992, the plaintiff wrote Rascati a memo stating that she did not want to ride in State vehicles with persons who smoked or drank. The following day, she attended a meeting of the garage employees on the issue of toxic waste. Despite her memo and the State's policy that there should be no smoking in State buildings, when the plaintiff arrived at the meeting, many individuals were smoking and the room was filled with smoke. One of her co-workers stood outside the room because the smoke was bothering him so much. When Rascati inquired why the co-worker was standing outside, the co-worker responded that it was because of the smoke. Only then did Rascati order the employees to quit smoking. An argument erupted, with Tricarico at the fore, making comments such as, "that's what you get for hiring a girl;" and "what about them, they eat chicken, I find that offensive." Rascati did not respond to these comments nor did he take any steps to stop the derogatory comments.

The next day, January 23, 1992, when the plaintiff went to her locker, she found that a gold liquid had been poured on her clothes and shoes.[4] She thought that the liquid might be urine. She immediately went to Rascati and reported the incident. She

states that she was very upset and afraid. Rascati accompanied her to her locker and, after examining the liquid, told her that it was diesel fuel. He told her to move her things to another locker, and he took and destroyed the container with the diesel fuel.

The plaintiff states that she contacted DOT's affirmative action office on at least three occasions regarding the incidents of intimidation, but that this did not stop the vandalism. Rascati told her that she would have to call the State police to investigate the acts of vandalism.

On January 23, 1992, the plaintiff was assigned to ride with a co-worker who smoked, despite her previous memo. She was upset that Rascati would not accommodate her request.

That same day, on her way home, the plaintiff's car engine "seized," and she had to have her car towed to a mechanic. The mechanic told her that her car had been vandalized and the oil had been drained out. This ruined her car, which was her only means of transportation.

The following day, January 24, 1992, the plaintiff attended a fact-finding meeting, which had been called to respond to her written memo about drinking and smoking in State vehicles. Because of the incidents of vandalism that had occurred, these incidents were also discussed. No affirmative action representative was present. However, a personnel officer was in attendance, as well as the maintenance district manager.

At the hearing, the plaintiff refused to name the individuals who had been drinking on the job. She stated that, in light of the vandalism that had occurred, she feared for her safety if she came forward and named the individuals who had been drinking. She also believed this information was already known to Rascati. In terms of the smoking,

---

2. Rascati's deposition testimony is somewhat equivocal in this regard. He does state that it did not appear to him that the tire had been slashed, although it is not clear from his testimony whether he actually went out and examined the tire. It also is not clear whether this observation pertained to this first incident or the second, which is discussed *infra*. *See* Rascati 3/30/98 depo. at 91.

3. *See* Note 2, *supra*.

4. The condition of the plaintiff's clothes was witnessed by her co-worker, George Alvelo, who describes them as "completely saturated and ruined." Alvelo Affidavit at ¶ 9.

the plaintiff stated that she was allergic to smoke and would like all smoking stopped in the garage and State vehicles. The State did not have an established policy for smoking in State vehicles, but the district manager stated that they would do their best to keep the plaintiff in smoke-free vehicles. The plaintiff also complained that certain co-workers would come around her while smoking and put their cigarettes in her face. The incidents of vandalism were discussed but nothing was resolved. The plaintiff also described the harassment she had experienced by her co-workers, including derogatory remarks about her being a woman. The hearing report concluded:

> In conclusion, a solution will be worked on to straighten these problems out. In the meantime, an offer was made to Ms. Edwards that she could report to another garage location, at least until we have completed an investigation. She did not wish to do this.

The plaintiff states that she rejected the offer of a transfer because she did not feel that her safety could be insured due to the exchange of information that takes place between the garages. Moreover, she states that this transfer was not reasonably calculated to end the harassing behavior and unfairly penalized her, the victim of the discrimination, rather than the perpetrator of the discrimination.

When plaintiff returned to work at the North Haven garage on January 27, 1992, her locker had been vandalized once again. Her protective clothing and boots had been taken, and when she reported this to Rascati, he simply told her to work without them. The State Police investigated the incident but suspended the investigation due to the lack of evidence. The plaintiff states that, concerned for her safety, she left work and formally resigned on February 7, 1992, in what she describes as a constructive discharge.

DOT has an Affirmative Action Policy Statement, issued semiannually and posted in all DOT facilities, which details DOT's commitment to its affirmative action program. The statement notifies employees of their rights in connection with a discrimination-free workplace and advises employees of the affirmative action office and telephone number. According to DOT, all new employees are given a copy of the affirmative action plan and programs as part of their orientation. Additionally, an affirmative action discrimination complaint procedure is posted at every maintenance garage. All newly hired or promoted supervisors are trained in the area of employment discrimination, including preventing a hostile work environment.

As a result of the affirmative action office's investigation of the plaintiff's internal discrimination complaint, on June 1, 1992, Tricarico received a "written counseling" from Rascati, informing him that he had violated DOT's affirmative action policy which prohibits discrimination in the workplace. Rascati states in the memorandum that he had been informed by the affirmative action office that there was evidence to substantiate the allegations by the plaintiff that Tricarico had made offensive or derogatory racial remarks. The memorandum stated:

> This written counseling is issued to document this violation and the seriousness of this offense and to warn you that any future confirmed reports of similar behavior or any form of retaliation against coworkers will be grounds for severe disciplinary action up to and including termination.

Tricarico refused to acknowledge receipt of the memorandum.

Additionally, on June 1, 1992, every member of the garage received a memorandum indicating that the affirmative action office's investigation had revealed "some substance" in the complaint concerning internal discrimination at the New Haven garage, and warning that inappropriate language, jokes, and profanity are in direct violation of the personnel rules, and are grounds for disciplinary action. Of course, by this time, four months had elapsed since the plaintiff left her employment with DOT.

### Discussion

The plaintiff has alleged two claims of discrimination: first, that her supervisor and crew leaders discriminated against her on the basis of her race and gender in making

job assignments; and second, that she was subjected to a sexually and racially hostile work environment that culminated in her constructive discharge.

### A. Discrimination in Job Assignments

■ The plaintiff claims that she was discriminated against by her crew leaders and by her supervisor Rascati on the basis of her race and gender in terms of the type of job assignments that she received. For example, she complains that, because she is an African–American woman, she was required to clean the toilets, a job not given to her male, non-minority co-workers.

■ Making job assignments based upon an employee's gender or race can constitute actionable discrimination under Title VII. *See Woodbury v. New York City Transit Authority,* 832 F.2d 764 (2d Cir.1987). To establish a *prima facie case* of gender-based or race-based discrimination, a plaintiff must show that she was treated less favorably than comparable male or non-minority employees in circumstances from which a gender-based or race-based motive could be inferred. *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997). The plaintiff has testified under oath that she, along with other minorities, were given the less desirable work assignments than similarly situated non-minority coworkers. *See Id.* She has also produced the affidavit of George Alvelo, a Puerto Rican coworker of hers, which supports her claim. DOT, of course, has denied these allegations, but has produced no evidence to contradict the plaintiff's sworn testimony and the testimony of her co-worker. Indeed, DOT's motion for summary judgment ignores this count of the plaintiff's complaint altogether. Although the evidence is rather scant, we find that the plaintiff has produced sufficient evidence to carry her *de minimis* burden of establishing a *prima facie* case of discrimination. Therefore, we

deny DOT's motion for summary judgment on this claim.

### B. Hostile Work Environment

■ The plaintiff's second claim is that she was subjected to a hostile work environment based upon her race and gender, which ultimately resulted in her constructive discharge.[5]

■ In order to prevail on a hostile environment claim under Title VII, a plaintiff must establish two elements. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997). First, she must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted); *see also Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The sexually objectionable environment must be both subjectively and objectively offensive: one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. The Supreme Court in *Harris* instructed that a court should look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Id.* at 23, 114 S.Ct. 367. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* —— U.S. ——, 118 S.Ct. 2275, 2283 n. 1, 141 L.Ed.2d 662 (1998). "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . . —as well as evidence of specific hostility directed toward the plaintiff—is an

---

**5.** Although the plaintiff has alleged, any may choose to attempt to prove at trial, that she was constructively discharged, this is not a necessary element of a hostile work environment claim. *Roberts–Goodell v. Killeen,* No. 3:94 CV 25AHN, 1997 WL 766857, at *3 (D.Conn. Nov.4, 1997). The Second Circuit has recognized that a plain-

tiff need not show the loss of a tangible job benefit as a result of the harassment. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d cir.1992); *see also Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

important factor in evaluating the claim." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997) (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir.1987)) (internal quotations and emphasis omitted). The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See, e.g., Oncale v. Sundowner Offshore Services, Inc.*, —— U.S. ——, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Thus, to prevail on a hostile work environment claim, the plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment. *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir.1995).

Second, the plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Perry v. Ethan Allen*, 115 F.3d at 149; *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 249 (2d Cir.1995). This second element will be discussed more fully below.

### 1. Was the harassment severe and pervasive?

In the instant case, construing the facts in the plaintiff's favor, the plaintiff, the only African–American woman assigned to road work, was allegedly subjected to a variety of hostile incidents, including having two tires on her car slashed and her car engine tampered with, having diesel fuel thrown on her clothes and her equipment stolen from her locker, being subjected to derogatory comments about "girls" being unable to do the work,[6] being required to perform menial jobs that her co-workers were not required to do, and having co-workers purposefully blow smoke in her face after she complained about people smoking and drinking on the job. Plaintiff has testified that she felt

threatened and was frightened by these incidents. There is no evidence to refute her testimony concerning her subjective feelings. Thus, the plaintiff has satisfied the subjective component of establishing a hostile environment claim.

A hostile work environment claim, however, also encompasses an objective component. Whether a reasonable person would objectively perceive this conduct to create a hostile work environment is a matter frequently left to the sound discretion of reasonable jurors. Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is often difficult and, in many cases, inappropriate. *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414 (S.D.N.Y.1998); *DiLaurenzio v. Atlantic Paratrans, Inc.*, 926 F.Supp. 310, 314 (E.D.N.Y.1996); *see also Gallagher v. Delaney*, 139 F.3d at 342–43, 346 (noting the "dangers of robust use of summary judgment" in sexual harassment cases and the difficult problems of proof inherent in these cases). Had the plaintiff's only allegations of a hostile work environment been the racially and sexually derogatory comments, we would find that these were insufficient from an objective standpoint to meet the requirements for a hostile environment claim under Title VII. "For racist [or sexist] comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial [or sexual] enmity." *Schwapp*, 118 F.3d at 110 (citing *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986)) (internal quotations omitted). However, plaintiff has testified that there were a number of other very significant acts of vandalism directed toward her. Resolving ambiguities and drawing all reasonable inferences in the plaintiff's favor, we cannot say as a matter of law that these incidents could not amount to a claim of a hostile work environment. *Schwapp*, 118 F.3d at 112. A reasonable jury could find that the totality of the incidents of which the plaintiff complains

---

**6.** The plaintiff has also produced the affidavit of a co-worker, who is Puerto Rican, attesting to the fact that he witnessed Tricarico making sexually harassing comments to the plaintiff, al-

though he does not describe what these comments were. He also testified that Tricarico and other co-workers repeatedly used ethnic slurs around him.

were sufficiently severe and pervasive to constitute a hostile work environment.

### 2. Was the harassment based upon gender or race?

■ The more difficult issue in this case is whether the alleged harassment was based upon the plaintiff's race or gender, which is an essential element of the plaintiff's hostile work environment claim under Title VII. *See Booker v. Budget Rent–A–Car Systems*, 17 F.Supp.2d 735, ——, No. 3:94–0048, 1998 WL 546852, at *7 (M.D.Tenn. July 13, 1998). While a jury could find that the hostile conduct directed toward the plaintiff was because she was the only female doing roadwork at the New Haven garage, or because of her race, the jury could also find that it was directed at her because of her "whistle-blowing" activities. The plaintiff had complained to her supervisor about co-workers smoking in State buildings and vehicles and drinking on the job. These complaints could have caused the plaintiff's co-workers to retaliate against her. However, there is also evidence of racial and sexual animosity toward the plaintiff. There is enough in the record for this issue to go to the jury. Thus, we find genuine issues of material fact as to whether the plaintiff was subjected to a hostile work environment based upon her race or gender.

### 3. Is DOT Liable for the Harassment?

■ DOT asserts that, even if we were to find a hostile work environment, DOT cannot be liable for the alleged discrimination. DOT argues:

> [i]t is important to remember that it is the employer, DOT, and *not* Rascati the supervisor, who is the named defendant in this lawsuit. Consequently, the question to be addressed by the Court is what did the DOT do or fail to do with respect to the working environment at the North Haven garage.

Def. Reply Mem. at 3.

■ A plaintiff pursuing a hostile environment claim must establish a basis, rooted in common-law agency principles, on which to hold an employer liable for the acts of its employees. *Gallagher*, 139 F.3d at 348 (citing *Meritor Sav. Bank*, 477 U.S. at 72, 106 S.Ct. 2399). The most recent pronouncements of the Second Circuit have held that this predicate can be established if: (a) the supervisor was at a sufficiently high level in the company; or (b) the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship; or (c) the employer provided no reasonable avenue for the complaint; or (d) the employer knew (or should have known) of the harassment but unreasonably failed to stop it. *Gallagher*, 139 F.3d at 348 (citing *Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997)).

Since these decisions, the Supreme Court handed down two decisions, *Burlington Industries, Inc. v. Ellerth*, —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("*Ellerth*"), and *Faragher v. City of Boca Raton*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ("*Faragher*"), which have significantly reshaped the standards for determining employer liability in sexual harassment cases. *See Ponticelli*, 16 F.Supp.2d at 427, 1998 WL 564012, at *14; *Booker*, 17 F.Supp.2d at ——, 1998 WL 546852, at *10. This Court initially considered whether to invite the parties to submit additional briefs addressing the impact of these decisions on the facts of this case.[7] However, the Court has determined that, based upon the extensive evidence submitted by the parties and the fact that the alleged harassment in this case was by the plaintiff's co-workers, an issue not addressed by *Ellerth* and *Faragher*, further briefing is not warranted. *See Seepersad v. D.A.O.R. Security, Inc.*, No. 97 CIV. 2086(SS), 1998 WL 474205, at *4 (S.D.N.Y. Aug.12, 1998).

In *Ellerth* and *Faragher*, the Supreme Court disregarded the actual or constructive knowledge requirement when the harassment is perpetrated by the plaintiff's immediate or successively higher supervisor. *See Ocheltree v. Scollon Productions, Inc.*, No. 97–2506, 1998 WL 482783, at *3 (4th Cir. Aug.11, 1998). Under the new standard an-

---

7. The Court notes that neither party has requested permission to file an additional brief.

nounced by the Supreme Court in these twin decisions, when a tangible adverse employment action [8] is taken, the employer is always vicariously liable. *Ellerth,* —— U.S. at ——, 118 S.Ct. at 2269. However, when there has been no adverse tangible employment action taken, the Court adopted the following test:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed.Rule Civ.Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher,* —— U.S. at ——, 118 S.Ct. at 2279; *Ellerth,* —— U.S. at ——, 118 S.Ct. at 2270. The *Faragher* and *Ellerth* cases, however, did not address harassment by co-workers, as opposed to harassment by the plaintiff's supervisors. *Ponticelli,* 16 F.Supp.2d at 427, 1998 WL 564012, at *14. The decisions following *Faragher* and *Ellerth* have presumed that existing Circuit caselaw on this subject was left in tact. *See, e.g., Ocheltree v. Scollon Productions, Inc.,* No. 97–2506, 1998 WL 482783, at n. 1 (4th Cir. Aug.11, 1998).

■ The Second Circuit has held that employer liability for a hostile work environment created by co-workers attaches only when the employer has "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." [9] *Murray,* 57 F.3d at 249 (citing *Kotcher,* 957 F.2d at 63); *see also, Perry v. Ethan Allen,* 115 F.3d at 149; *Torres v. Pisano,* 116 F.3d at 634. This standard is in keeping with the affirmative defenses articulated in *Ellerth* and *Faragher.* An employer who has notice of a discriminatorily abusive environment in the workplace has a duty to take reasonable steps to eliminate it. *Murray,* 57 F.3d at 249. Thus, the employer's liability is direct liability for negligently allowing the harassment, not vicarious liability for the harassing actions of its supervisors. *Williamson v. City of Houston,* 148 F.3d 462, 465 (5th Cir.1998).

In this case, DOT argues that, based upon the existence and posting of its affirmative action policies and the steps it took when it received notice of the plaintiff's complaints, there can be no genuine issue of material fact with respect to its liability. We disagree. In this case, the plaintiff reported all of the above-cited incidents to Rascati, whom she alleges took inadequate steps to address the harassment, which continued until she left her employment. It is not clear from the record whether the plaintiff attributed all of the incidents to gender or race discrimination when she reported them to Rascati, or whether she simply complained of the incidents. She did, however, also contact the affirmative action office on at least three occasions, which would imply that she considered these incidents to be discriminatory in nature. Although the affirmative action office did investigate her complaints, and found some substance to them, it was not until four months after the plaintiff left DOT that Tricarico received a letter of reprimand and that a memorandum was sent to the plaintiff's

---

8. The Court defined tangible employment action as one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* —— U.S. at ——, 118 S.Ct. at 2268.

9. *Murray,* in *dicta,* seemed to adopt an actual or constructive knowledge standard, based upon holdings in other circuits and the Equal Employment Opportunity Commission Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604 (1993). 57 F.3d at 249. In *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir. 1996), however, the Second Circuit clarified that knowledge of the harassment may include constructive knowledge.

former co-workers at the New Haven garage. Furthermore, although the plaintiff was offered a temporary transfer to another garage after the fact-finding hearing, the plaintiff has testified under oath that she was not satisfied with this proposed solution and feared for her personal safety because of the communications between the garages. Assuming that plaintiff's charges are true—that her tires had been slashed, her car tampered with, her locker broken into and her clothes stolen as harassment against her because of her gender and/or race—these are extremely serious charges, and plaintiff's fear for her safety is understandable.

 The Second Circuit has held that "[i]f the evidence creates an issue of fact as to whether an employer's actions is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher*, 139 F.3d at 348. Whether an employer has fulfilled its responsibility in this regard is to be determined from the facts of each case. Factors that may be considered include the gravity of the harm, the nature of the work environment, and the resources available to the employer. *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986). A jury could disagree on how appropriate and effective and prompt the employer's response was. *See Id.* (citing *Snell*, 782 F.2d at 1104) (holding that whether an employer has fulfilled its responsibility to remedy a racially discriminatory work environment is to be determined based upon the facts of each case). There is at least a genuine issue of material fact as to whether DOT's offering plaintiff a transfer and indicating that it would investigate was sufficiently prompt and effective to relieve it of liability for the allegedly hostile work environment of which it had knowledge. Accordingly, we find that summary judgment is inappropriate on this basis.

### Conclusion

For the foregoing reasons, this Court DENIES Defendant's Motion for Summary Judgment [**Doc. # 10**].

SO ORDERED.