Rebecca LEWIS, Brenda Heath, Linda Hughes, Martha Carver, Lois Gerstenberger and Rita Smith, Plaintiffs,

v.

David McDADE, Individually and in his Official Capacity as District Attorney, Defendants.

No. Civ.A. 195CV2766–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 13, 1999.

Allan Leroy Parks, Jr., Harlan Stuart Miller, III, David C. Ates, Parks, Chesin & Miller, Atlanta, GA, for plaintiffs.

Susan Lee Rutherford, Jeff L. Milsteen, Thurbert E. Baker, Christopher Andrew McGraw, Julia Anderson, Office of State Attorney General, Atlanta, GA, Kattegummula, Prabhaker, Reddy, Reddy & Silvis, Atlanta, Georgia, for defendants.

### ORDER

STORY, District Judge.

This case is before the Court for consideration of the Report and Recommendation [105–1] of Magistrate Judge Joel M. Feldman regarding Defendant McDade's Motion for Summary Judgment [84–1]. The Plaintiffs and Defendant have filed objections to the Report and Recommendation. Defendant has also filed a Motion to Exceed Page Limit [116–1] which is also

before the Court for consideration. After carefully considering the Report and Recommendation, the objections thereto, and the entire record, the Court enters the following Order.

■ As an initial matter, the Court denies Defendant McDade's Motion to Exceed Page Limit. Defendant McDade has had three prior opportunities to brief the issues in the motion for summary judgment. Defendant filed a brief of 50 pages in support of the motion for summary judgment [84–1], a brief of 25 pages in reply to Plaintiffs' responsive brief [92–1], and a brief of 22 pages in support of his objections to the Report and Recommendation [109–1]. Defendant McDade now requests permission to file a 67 page brief in response to Plaintiffs' objections to the Report and Recommendation [115–1]. A review of the proposed brief shows that substantial portions of it are simply restatements of arguments presented in prior briefs. It is the filing of briefs such as the one submitted by Defendant McDade which the Local Rule is intended to prevent. Therefore, Defendant McDade's Motion to Exceed Page Limit [116–1] is **DENIED.** The Court will not consider the brief for purposes of this Order.

## I. HISTORY OF THE CASE

This is a civil rights employment discrimination case filed by Rebecca Lewis, Brenda Heath, Linda Hughes, Martha Carver, Lois Gerstenberger, and Rita Smith, females who were employed in the office of the District Attorney for the Douglas Judicial Circuit. The suit was brought against Douglas County, Georgia, David McDade, individually and in his official capacity as District Attorney (hereinafter Defendant McDade), the Superior Courts of Georgia, and the Douglas Judicial Circuit. Plaintiffs allege that the Defendants have violated their civil rights by discriminating against them based on their gender, in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et. seq.) (hereinafter "Title VII"),

by failing to promote, terminating, and harassing them based on their sex and by denying them equal protection under 42 U.S.C. § 1983. Plaintiff Heath also alleges that the Defendants discriminated against her based on her alleged disability by failing to provide her with a reasonable accommodation in violation of the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101 and the Rehabilitation Act of 1973, 28 U.S.C. § 791 (hereinafter "Rehabilitation Act").

By Order dated January 15, 1999, motions for summary judgment were granted to Defendants Superior Courts of Georgia and the Douglas Judicial Circuit. By Order dated March 30, 1999, summary judgment was granted to Douglas County, Georgia. Presently pending before the undersigned is Defendant McDade's Renewed Motion for Summary Judgment [84–1]. The Magistrate Judge has issued a Report and Recommendation [105–1] recommending that the motion be granted in part and denied in part. The Plaintiffs and Defendant have filed objections to the Report and Recommendation.

## II. FACTUAL BACKGROUND

The Court adopts the summary of the facts set out in Parts Three and Four of the Report and Recommendation and incorporates the same herein by reference. A summary of those facts follows.

In Georgia, district attorneys are elected Georgia state constitutional officers within the judicial branch of state government. Georgia law empowers district attorneys to represent the interests of the State in prosecuting criminal violations occurring within their respective judicial circuits. In order to assist the district attorney in performing these duties, Georgia law empowers each district attorney to employ assistant district attorneys, secretaries, and investigators. Each of these employees serves at the pleasure of the district attorney and may be compensated by either state or county funds. The dis-

trict attorney assigns the duties and responsibilities for the persons in each of these positions.

Defendant McDade was elected District Attorney for the Douglas Judicial Circuit in the summer of 1990. Though persons employed in the District Attorney's office are paid by the State and/or Douglas County, the authority to hire, supervise, discipline, and terminate these employees rests with Defendant McDade.

Plaintiff Lois Gerstenberger was hired as an assistant district attorney by Defendant McDade's predecessor, Frank Winn, on November 1, 1986. After Defendant McDade was elected District Attorney, he allowed Plaintiff Gerstenberger to continue to work as an assistant district attorney in the office. Plaintiff Gerstenberger resigned on August 18, 1994, to be effective September 2, 1994.

In January, 1990, then District Attorney Winn employed Plaintiff Martha Carver as the first and only Victim–Witness Coordinator for the District Attorney's office. Defendant McDade also allowed Plaintiff Carver to continue in this position from January 1, 1991 until she submitted her resignation on September 26, 1994, effective two weeks later.

In March, 1990, then District Attorney Winn employed Plaintiff Rebecca Lewis as his office receptionist. In November, 1990, Plaintiff Lewis was transferred to the data entry position. Defendant McDade allowed Plaintiff Lewis to remain in this position until she submitted her resignation on September 23, 1994, effective October 8, 1994.

Then District Attorney Winn employed Plaintiff Linda Hughes as a county-paid secretary in August, 1990. In April, 1994, Plaintiff Hughes was appointed to a state-funded secretary position. Upon his election, Defendant McDade allowed her to remain in this position. By letter dated August 18, 1994, Plaintiff Hughes submitted her letter of resignation to Defendant McDade.

In January, 1979, Plaintiff Rita Smith was hired by then District Attorney Winn as a state-funded secretary in the District Attorney's office. Defendant McDade allowed Plaintiff Smith to continue in her employment in this position until she resigned on October 23, 1995. Plaintiff Smith functioned as the District Attorney's Office Manager from January, 1991 until February, 1995.

In July, 1988, Plaintiff Brenda Heath was appointed as the Douglas District Attorney's first and only investigator by then District Attorney Winn. Defendant McDade allowed Plaintiff Heath to remain in this position until he terminated her on February 3, 1995.

There is no evidence that during 1994 and 1995, the Douglas District Attorney's office employed more than fifteen (15) employees, as that term is defined at 42 U.S.C. § 2000e(f), for each working day in each of twenty (20) or more weeks during that calendar year.

The office of the District Attorney operated very informally. Employees often engaged in sexually suggestive language and activities. The Magistrate Judge has reviewed this conduct in detail in the Report and Recommendation which is incorporated herein. However, a brief summary of that evidence, construed in a light most favorable to Plaintiffs, follows.

Defendant McDade would tell a woman employee to walk down the hall so that he could watch her walk from behind. (Lewis Dep., p. 71). On occasion, he made comments about Plaintiff Lewis' legs and that her dress was a "turn-on." (Lewis Dep., pp. 67–69). Defendant McDade would often throw coins down the blouses or bras of the female employees. (Carver Dep., 128–29; Hughes Dep., pp. 73–74; Lewis Dep., pp. 72–74; Gerstenberger Dep., p. 138; Smith Dep., pp. 94–95). Defendant McDade also shot rubber bands at the breasts and buttocks of the female employees. (Carver Dep., pp. 133–35). On several occasions, Defendant McDade lifted

Plaintiffs Gerstenberger and Smith off the ground. (Gerstenberger Dep., 141–44; Smith Dep., pp. 254–57, 259). Defendant McDade lifted the suit jacket of Plaintiff Gerstenberger and looked and pointed at her buttocks. (Gerstenberger Dep., 144–46). When someone would knock on his door while a woman was in his office, on occasion Defendant McDade would state, "You can't come in, she doesn't have her clothes on" or "Don't come in right now, I don't have my pants on." (Smith Dep., pp. 91–92, 94, 96–97). Defendant McDade told Assistant District Attorney Perrin (a female employed from November, 1991 through July, 1992) she would have to wear the office uniform (a bikini) while playing volleyball at the Prosecuting Attorneys Council Meeting. (Perrin Dep., pp. 50–51). On an occasion when a man was being prosecuted who had obtained a penile implant, Defendant McDade carried the implant around the office proclaiming he was larger than the implant. (Perrin Dep., pp. 38–39).

Plaintiffs also participated in the sexual games and conduct in the office. On one occasion, the female employees dressed as prostitutes. (Lewis Dep., pp. 167–68, 173; Carver Dep. pp. 165, 302–03). The female employees gave Defendant McDade a photo album with sexually-charged comments accompanying the photographs. (Carver Dep., 164–65, 167). On one occasion, the female employees presented Defendant McDade with an ice sculpture of breasts. (Carver Dep., pp. 305–08). Also, a tape recorded montage of sexual comments and innuendos was prepared for Defendant McDade. (Carver Dep., 168). The Plaintiffs also gave Defendant McDade a number of cards and notes praising him as a boss. (Defendant's Exhibits 7, 10, 11, 53, 55, 78, 80, 87, 88, 91). At times, Plaintiffs were unoffended by Defendant McDade's conduct and willingly joined in it. At other times, they found his conduct demeaning. (Hughes Dep., 75). Though at times certain of the Plaintiffs may have mildly intimated displeasure with some of the sexual comments or activities, no Plaintiff lodged any type of formal complaint concerning the same.

Defendant McDade also used language and conduct which, while not sexual in nature, was demeaning and abusive toward females. Again, this conduct is described in detail in Parts Three and Four of the Report and Recommendation, which have been incorporated herein, but a summary follows. Defendant McDade would often yell at the female employees and use abusive language. (Responses of Plaintiff Lewis to Interrogatories, No. 18). On one occasion, he loudly cursed Plaintiff Lewis in a courtroom filled with people. (Responses of Plaintiff Lewis to Interrogatories, No. 18). On another occasion, Plaintiff Lewis delivered a book for Defendant McDade to Detective Shaddix. Detective Shaddix was not in his office, and Detective Brumbalow took the book from Plaintiff Lewis for Detective Shaddix. When she told Defendant McDade what had occurred, he pounded his fist on the desk and said, "What in the hell did I tell you to do with the goddamn mother fucking book!?" When Plaintiff tried to explain that Detective Brumbalow had taken the book from her and placed it on Detective Shaddix's desk, Defendant stated, "Does Brumbalow sign your goddamn paycheck?" Plaintiff started trembling and was speechless. Defendant finally told her to leave his office. (Responses of Plaintiff Lewis to Interrogatories, No. 18).

When females would ask for time off for medical reasons, Defendant routinely stated that the employee was "having her annual nervous breakdown," or "sunbathing on the deck," or "PMS'ing." When a woman employee would make a statement or ask a question in front of visitors, Defendant McDade would often respond "that's not true" or "that didn't happen." (Supplemental Response of Plaintiff Lewis to Interrogatories, No. 18). When women employees would ask for a second of Defendant McDade's time, he would often say "not unless you've got an empty pocket, I

gotta pee!" (Responses of Plaintiff Hughes to Interrogatories, No. 18).

Defendant McDade required Plaintiff Heath to work on his campaign. Plaintiff Heath asked Defendant McDade if he wanted the other women in the office to help. He replied, "I don't want a bunch of stupid lazy women getting in the way but you be there at 6 p.m." Plaintiff Heath had to get the food, buy beer, cigarettes, etc. for the "men" who helped. (Responses of Plaintiff Heath to Interrogatories No. 18).

Immediately after Plaintiff Hughes began working in the District Attorney's office, she noticed Defendant McDade was disrespectful and insulting to women. During her first few days, Defendant McDade came into the secretaries' office and demanded loudly that he wanted somebody to "pick up this file" and do the work required. He then dropped the file in the middle of the floor and all three (3) secretaries immediately went to their knees to retrieve the file. (Responses of Plaintiff Hughes to Interrogatories, No. 18).

When Defendant McDade wanted to throw out something from his mail basket, he would drop it on the floor beside Plaintiff Hughes' desk. When she would move her trash can under his hand to catch the trash, Defendant McDade would deliberately move over causing the trash to fall on the floor and causing Plaintiff to get on the floor to pick it up. (Responses of Plaintiff Hughes to Interrogatories, No. 18).

Defendant McDade constantly pitted the women in the office against one another by telling them lies about the other women. (Responses of Plaintiff Hughes to Interrogatories, No. 18). Defendant McDade would have swimming parties at his home and require all of the women employees to come and to wear bathing suits. (Responses of Plaintiff Hughes to Interrogatories, No. 18).

Defendant McDade referred to women in the following terms: "that bitch," "blonde," "friggin idiot," "hysterical," "whi-

ney," "squalling," "my baby," "a honey," "fucking bitch," "feather head," "bazumbas," "stupid bitch," "whoa baby!" He used these terms in reference to women lawyers, women in the District Attorney's and Clerk's offices, women victims, and women members of victims' families. (Responses of Plaintiff Hughes to Interrogatories, No. 18).

Defendant McDade referred to employee Rita Fitzpatrick as a "bleach blonde," "a hypochondriac," "money grubber," and a "hysterical female." Further, he stated that he thought she had breast implants. (Smith Dep., pp. 50–51). Fitzpatrick complained to Plaintiff Smith that she felt Defendant McDade's actions were discriminatory towards women. (Smith Dep., p. 53). McDade told Smith that "she [Fitzpatrick] wouldn't last six months—that there was more than one way to skin a cat and he wanted her to resign." He then ignored Fitzpatrick's comments and questions and ordered her to carry big boxes of files upstairs eve though she was ill. Ultimately, she resigned. (Smith Dep., pp. 166–67).

On two occasions, Defendant McDade hit Plaintiff Carver. On the first occasion, he hit her in the presence of the head of the Council on Battered Women in Atlanta. Defendant McDade said he did it to see what the reaction of the Director of the Council on Battered Women would be. Plaintiff Carver was shocked and did not laugh or think the matter was a joke. The second occasion occurred in the last year of Plaintiff Carver's employment. On that occasion, Defendant McDade simply walked up and hit her. He did not say anything, but the hit left a mark on her. Plaintiff Carver simply responded, "Ouch, that hurt." On another occasion, Defendant McDade grabbed Plaintiff Carver and told her that she did not know how close he had come to hitting her. (Carver Dep., pp. 111–14).

Plaintiff Gerstenberger asserts that, as a female, she was discriminated against in comparison to the males based upon her

greater case load, lesser salary, failure to obtain promotion to a state-paid position and less favorable benefits and vacation time. (Responses of Plaintiff Gerstenberger to Interrogatories, No. 18). In 1990, Defendant McDade stated to Plaintiff Hughes that Plaintiff Gerstenberger was an idiot, and he was looking for a way to fire her. He asked Plaintiff Hughes to watch her and report anything to him for which he could fire her. Defendant McDade also remarked that if he fired her she would sue him for sexual harassment, that she had once "sicked her husband" on him about some joke in a lawyer's meeting. (Responses of Plaintiff Hughes to Interrogatories, No. 18). Defendant McDade refused to act on leave requests by Plaintiff Gerstenberger and directed Plaintiff Hughes that she was to put down no overtime on Gerstenberger's time sheets no matter how long she worked. (Responses of Plaintiff Hughes to Interrogatories, No. 18). Defendant McDade told Plaintiff Smith, as office manager, that he "had decided to not hire any more women assistant district attorneys because they don't have what it takes." He instructed her that if any resumes came in from women, Smith was to interview the woman and then send her a regret letter. (Supplemental Responses of Plaintiff Smith to Interrogatories, No. 19).

Assistant District Attorney Janet Perrin stated that Defendant McDade often denigrated women by stating "if you're a woman, you just don't have the 'kahonees' or … the 'stones' to be a prosecuting attorney." He also stated that Perrin and Gerstenberger, in particular, did not have the "balls" to prosecute criminals. (Perrin Dep., pp. 51–52, 80–81).

When Plaintiff Heath had to have surgery, she advised Defendant McDade she would require an extended period of leave. From the time she made this request, Defendant McDade refused to speak to her. Prior to Defendant McDade terminating Plaintiff Heath, he told Plaintiff Smith that he was going to fire Heath, and if Smith told Heath, Smith would be fired. When Plaintiff Heath was having physical problems because Defendant McDade had assigned her to work the phone, Plaintiff Heath sent Defendant McDade a memo requesting to speak with him. Instead, Beau McClain, the Chief Assistant District Attorney, met with her and informed her that her memo had made Defendant McDade furious, and she was lucky that Defendant McDade had not hit her. (Responses of Plaintiff Heath to Interrogatories, No. 18; Heath Dep., pp. 120, 161–65; Responses of Plaintiff Smith to Interrogatories, No. 18; Smith Dep., pp. 150–51, 222).

In December, 1993, Plaintiff Carver submitted a letter of resignation to Defendant McDade. Defendant McDade asked what he had to do to get her to stay. Plaintiff Carver told him that he would have to get counseling for the way he treated women in the office. (Carver Dep., pp. 117–19).

Cathy Tatay, an employee in the District Attorney's office, complained about sexual harassment by Beau McClain. Defendant McDade stated that "Cathy Tatay's neurotic. She's got all kinds of mental problems, and I don't believe this about Beau." When McClain was on vacation, McDade reassigned Tatay to work for another attorney. When McClain returned and found that Tatay had been reassigned, he was upset. Defendant McDade then stated that the transfer was a stupid thing to do. He stated, "I don't know why I reassigned her. I should have left her right where she was. Beau doesn't have a right to be treated that way, he's Chief Assistant D.A., if he wants her as his secretary, by God, that's who he ought to have, and if she doesn't like it then she can just get out." Defendant McDade told Plaintiff Smith that he was going to force Tatay to resign because she complained about McClain. Defendant McDade moved Tatay from the secretarial area into the hallway outside McClain's office directly in McClain's line of vision and from where she could be easily overheard in McClain's

office. (Supplemental Responses of Plaintiff Smith to Interrogatories, No. 18; Responses of Plaintiff Hughes to Interrogatories, No. 18). Tatay resigned. (Response of Plaintiff Lewis to Interrogatories, No. 18).

Defendant McDade stated that any complaints about office matters which were made outside the office would be grounds for immediate termination. Plaintiff Hughes complained to the court administrator and a superior court judge about Defendant McDade but was told that she had no recourse but to resign. (Supplemental Responses of Plaintiff Hughes to Interrogatories, No. 18).

Defendant McDade intimidated Plaintiffs by stating that as for anyone who embarrassed him with a lawsuit, he would "own all their houses and they will send all [his] children to college." (Supplemental Responses of Plaintiff Smith to Interrogatories, No. 19).

One day when several women in the office were discussing dreams, Defendant McDade stopped and listened. He stated that he had two recurring dreams. In one of those, he killed a woman by cutting her head off. When he would awake, he was never sure if it was real or a dream. (Responses of Plaintiff Hughes to Interrogatories, No. 18).

Douglas County issued sexual harassment policies which Defendant Smith distributed to all employees of the District Attorney's office. (Smith Dep., pp. 85–86, 377). The policies provided that an employee who felt that he or she was a victim of sexual harassment should bring the matter to the immediate attention of his or her supervisor, the personnel director, or the county manager. No plaintiff ever filed a formal complaint pursuant to those policies. (Carver Dep., p. 279; Hughes Dep., p. 266; Lewis Dep., p. 217). However, Plaintiff Smith reported Tatay's complaints to Gloria Turner, the Douglas County Personnel Director. She also told Turner there was a lot of employee dissension in the District Attorney's office, that

the female employees were very upset about their treatment; that several women had left; and that Smith feared that others were going to leave because of what was going on in the office. Turner acknowledged that she had attended seminars on sexual harassment and the conduct appeared to be sexual and gender-based harassment. (Smith Dep., p. 380–81). However, no action was taken.

## III. DISCUSSION

### A. THE STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a district court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is (1) no genuine issue as to any material fact and that (2) the moving party is entitled to judgment as a matter of law." The applicable substantive law identifies which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11.

When the nonmovant has the burden of proof at trial, the movant may carry its burden at summary judgment by demonstrating the absence of an essential element of the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.E.2d 265 (1986). In determining whether the movant has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. If the movant meets this burden, the nonmovant then has the burden of showing that summary judgment is not appropriate by setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## B. TITLE VII CLAIMS

Defendant McDade contends that he is not an "employer" as defined by Title VII because he does not employ more than fifteen (15) people. Plaintiffs respond that because they have sued Defendant McDade in his official capacity in their Title VII actions, the State of Georgia is the "employer." Defendant McDade replies that Plaintiffs' failure to actually name the State of Georgia as a party is fatal to their claim.

The latter issue has been resolved adversely to Defendant McDade by the United States Supreme Court. In *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985), a judgment for damages had been obtained against the Director of the Memphis Police Department, in his official capacity. The City of Memphis was not a named defendant in the suit. The Court held "that a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond." *Id.,* at 471–72, 105 S.Ct. at 878. In his concurring opinion, Chief Justice Burger suggests that the Court's holding offends orderly procedure by not requiring that the pubic entity be named. But his opinion makes it abundantly clear that such is not required under the majority's opinion in the case. *Id.,* at 473–74, 105 S.Ct. at 879.

Defendant McDade argues that *Brandon* is not controlling on this issue because it was a § 1983 action and not a Title VII action. However, the Eleventh Circuit has held that "the proper method for a plaintiff to recover under Title VII is by suing his employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly." *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991). Thus, the State of Georgia is a party to this action.

Defendant McDade further argues that even if the State of Georgia is found to be a party, the Court still must determine if the State is to be treated as a single "employer" under Title VII. The Eleventh Circuit has established the standard for determining whether to aggregate state and local governmental entities or to treat them as separate entities. The Court held:

> that when assessing whether multiple governmental entities are a single "employer" under Title VII, we begin with the presumption that governmental subdivisions denominated as separate and distinct under state law should not be aggregated for purposes of Title VII. That presumption may be rebutted by evidence establishing that a governmental entity was structured with the purpose of evading the reach of federal employment discrimination law. Absent an evasive purpose, the presumption against aggregating separate public entities will control the inquiry unless it is clearly outweighed by factors manifestly indicating that public entities are so closely interrelated with respect to control of the fundamental aspects of the employment relationship that they should be counted together under Title VII.

> The standard we adopt is not whether a fact finder reasonably could conclude the Plaintiff has overcome the presumption. Instead, the standard is whether the fact finder reasonably could conclude the plaintiff has *clearly* overcome the presumption. The adverb "clearly," which derives from the federalism concern we have discussed, is meant to be limiting. It is a thumb on the scale, and sometimes it will be decisive because federalism concerns should sometimes be decisive. Absent evidence of evasive purpose, in order to survive a motion for summary judgment, a plaintiff will have to show that a reasonable fact finder could conclude that the presumption of distinctness is clearly outweighed.

\* \* \* \* \* \*

Several factors will guide our determination of whether the presumption in favor of the distinctness of the public entities is clearly outweighed—or at the summary judgment stage, whether a finder of fact could reasonably conclude that it is clearly outweighed. As we have already noted, the NLRB factors of "interrelation of operations" and "centralized control of labor operations," [cits.] may continue to be helpful in the inquiry. Useful "indicia of control" may be drawn from the agency context, including: " 'the authority to hire, transfer, promote, discipline or discharge; the authority to establish work schedules or direct work assignments; [and] the obligation to pay or the duty to train the charging party.' " [cits.]

*Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1345–46 (11th Cir.1999).

 Defendant McDade's office was essentially autonomous. He had total control over hiring, transfers, promotions, discipline, and discharges. There is no evidence that this structure was created for the purpose of evading federal employment discrimination law. The Court finds that Plaintiffs have to failed to show that a reasonable fact finder could conclude that the presumption of distinctness is clearly outweighed. Therefore, the office of the Douglas County District Attorney should be treated as a separate entity for Title VII purposes. The District Attorney did not employ more than fifteen (15) employees, as that term is defined in Title VII, for each work day in twenty (20) or more weeks during the applicable period. Accordingly, the District Attorney's office and the State of Georgia do not qualify as "employers" under Title VII.

For the foregoing reasons, Defendant McDade, in his official capacity, is entitled to summary judgment as to all of the Plaintiffs' Title VII claims.

## C. PLAINTIFF HEATH'S CLAIMS OF DISABILITY DISCRIMINATION

The Magistrate Judge recommends that Defendant McDade be granted summary judgment as to Plaintiff Heath's claims under the ADA and the Rehabilitation Act. The Magistrate Judge found that Plaintiff Heath failed to make out a prima facie case because she could not show that she had a covered disability or was regarded by her employer as having any such disability.

After reviewing the Report and Recommendation and the objections thereto, the Court accepts Part Five, Section II of the Report and Recommendation, adopts the same as the Order of this Court, and incorporates the same herein by reference. Accordingly, Defendant McDade's Motion for Summary Judgment [84–1] is **GRANTED** as to Plaintiff Heath's claims under the ADA and the Rehabilitation Act.

## D. SECTION 1983 CLAIMS

In this section of the Order, the Court will first address Defendant McDade's defenses based on the Eleventh Amendment and qualified immunity. After consideration of these defenses, the remaining § 1983 claims will be addressed as follows:

a) Claims by all Plaintiffs, except Heath, of hostile work environment

b) Claims by all Plaintiffs, except Heath, of constructive discharge

c) Claims by Plaintiff Gerstenberger of disparate treatment

d) Claims by Plaintiff Heath of discriminatory termination.

### 1. Eleventh Amendment Immunity

 Defendant McDade contends that he is entitled to immunity under the Eleventh Amendment to the United States Constitution for 42 U.S.C. § 1983 claims brought against him in his official capacity. Plaintiffs concede that Defendant McDade is entitled, in his official capacity, to immunity for any money damages. (Plaintiffs' Reply in Opposition to Defendant McDade's Renewed Motion for Summary Judgment [87–1], p. 46). However, Defendant McDade is not entitled to immunity

as to any claims for prospective injunctive relief. *Cross v. State of Alabama,* 49 F.3d 1490, 1503 (11th Cir.1995). Therefore, Defendant McDade is granted summary judgment for any claims by Plaintiffs for money damages against Defendant McDade in his official capacity.

## 2. Qualified Immunity

■ Defendant McDade objects to the Magistrate Judge's denying him qualified immunity. First, Defendant McDade argues that he did not violate any of Plaintiffs' clearly established rights. The Magistrate Judge found that Plaintiff Heath had a clearly established right to be free from sex discrimination. This Court further finds that all of the Plaintiffs had the clearly established right to be free from sex discrimination of the type alleged against Defendant McDade. *See Cross,* 49 F.3d 1490.

■ Second, Defendant McDade argues that the record is devoid of evidence of discriminatory intent on his part. The Court finds that there is sufficient evidence set out in the Factual Background section of this Order from which a jury could find that Defendant McDade's complained-of actions were based on the sex of Plaintiffs.

Accordingly, the Court adopts the reasoning and the conclusions set out in the Report and Recommendation on the issue of qualified immunity and denies Defendant McDade's Motion for Summary Judgment on this ground.

## 3. Hostile Work Environment Claims

Though Defendant McDade is entitled to summary judgment in his official capacity on all of Plaintiffs' claims under Title VII and on the damage claims under § 1983, the issue of Plaintiffs' claims for damages against Defendant McDade, in his individual capacity, under § 1983 must still be

addressed. Each of the Plaintiffs, except Plaintiff Heath, asserts a hostile work environment claim against Defendant McDade. The Magistrate Judge recommends granting Defendant McDade summary judgment on Plaintiffs' hostile work environment claims based on his conclusion that the affirmative defense of *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) has been established. However, this finding does not resolve individual capacity claims.[1]

■ "[Plaintiffs] have a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment. 'When section 1983 is used as a parallel remedy for violation of section 703 of Title VII [42 U.S.C. § 2000e–2], the elements of the two causes of action are the same.'" *Cross v. State of Alabama,* 49 F.3d 1490, 1507 (11th Cir.1995) (quoting *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir.1982)).

To establish the elements of a *"prima facie* case" of a hostile work environment based on an employee's sex under 42 U.S.C. § 1983, the Plaintiffs must show (1) Plaintiffs belong to a protected class; (2) Plaintiffs were subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a "term, condition, or privilege of employment." *Henson v. City of Dundee,* 682 F.2d 897, 903–905 (11th Cir.1982); *Cross,* 49 F.3d at 1504.

The parties agree that the Plaintiffs are females and, thus, members of a protected class. Plaintiffs have offered evidence that Defendant McDade constantly made comments disparaging and denigrating of his female employees, as well as numerous sexually charged comments and actions. They have also shown that he criticized his female employees more harshly than his

---

1. Faragher addressed the issue of vicarious liability of an employer for acts of a supervisory employee and did not establish an affir-

mative defense for the offending employee. *Faragher,* 118 S.Ct. at 2280.

male employees. The questions thus presented are (1) whether such comments and actions were "unwelcome" within the meaning of the Act, and (2) whether the harassment affected a "term, condition, or privilege of employment."

### a. *"Welcome" Versus "Unwelcome"*

■ Defendant McDade seeks to discount much of his alleged conduct on the grounds that it was not unwelcomed by Plaintiffs. He points out incidents of sexually suggestive conduct on Plaintiffs' parts which could be interpreted as inviting sexually-oriented responses from Defendant McDade. If this case were only about sexually-charged conduct, this Court would be inclined to agree that Plaintiffs failed to show that Defendant McDade's conduct was unwelcomed.

However, when one views the totality of the circumstances of this case, an extremely complex office environment is revealed. On the one hand, the parties engaged in sexual repartee which the Magistrate Judge attributed to their being lusty men and women. Plaintiffs also gave Defendant gifts and messages lauding him as a boss and as a friend. On the other hand, Defendant McDade engaged in other conduct that could in no way be described as sexual but rather as abusive and derogatory and directed only at the females in the office. There is no evidence that Plaintiffs welcomed the latter conduct. On the contrary, Plaintiffs did make attempts to express their displeasure to Defendant McDade. For example, in December, 1993, Plaintiff Carver submitted a letter of resignation because of the way Defendant McDade was treating female employees. When Defendant McDade offered to do whatever he needed to do to get her to stay, Plaintiff Carver told Defendant McDade he would have to get counseling for the way he treated women in the office. (Carver Dep., pp. 117–19). Also, Defendant McDade received a complaint from Plaintiff Gerstenberger's husband about a sexually suggestive incident which oc-

curred in a staff meeting, and Defendant McDade remarked to Plaintiff Hughes that if he fired Plaintiff Gerstenberger that she would sue him for sexual harassment. (Responses of Plaintiff Hughes to Interrogatories, No. 18). Thus, Defendant McDade was clearly put on notice that his conduct was unwelcomed and not acceptable to the females on his staff.

### b. *"Terms, Conditions, or Privileges of Employment"*

■ Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The prohibition is not limited to "economic" or "tangible" employment decisions but also "includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *see also Faragher*, 524 U.S. at ——, 118 S.Ct. at 2283. However, not all workplace conduct that may be viewed as "harassment" affects a term, condition, or privilege of employment within the meaning of Title VII. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quotation marks and citations omitted). Title VII is violated when the workplace is permeated with conduct "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher*, 524 U.S. at ——, 118 S.Ct. at 2283 (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405–2406; *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982)); *accord Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

> [T]he phrase "terms, conditions, or privileges of employment" in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with [sexual] discrimination . . .

One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of [protected class] workers...

*Meritor,* 106 S.Ct. at 2405 (*citing Rogers v. E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058 32 L.Ed.2d 343 (1972)).

 In determining whether an environment is sufficiently hostile or abusive as to be actionable under the statute, courts must " 'look[ ] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher,* 524 U.S. at ——, 118 S.Ct. at 2283 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. at 371); *accord Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 647 (11th Cir. 1997). In addition, a plaintiff must prove that the "environment [is] both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at ——, 118 S.Ct. at 2283; *Harris,* 510 U.S. at 21–22, 114 S.Ct. at 370–71; *accord Fleming v. Boeing Co.,* 120 F.3d 242, 245 (11th Cir.1997).

 Defendant McDade reviews the specific allegations of sexually discriminatory conduct as it relates to each Plaintiff, individually, in an effort to show that the conduct was isolated and was not frequent or severe enough to constitute actionable sexual harassment. However, "[o]ne of the critical inquiries in a hostile environment claim must be the *environment.* Evidence of a general work atmosphere therefore-as well as evidence of specific hostility directed toward the plaintiff-is an important factor in evaluating the claim." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (11th Cir.1987).

 Sexual harassment is not limited to cases involving unwelcome sexual advances. In order to sustain an action for a hostile work place, the Plaintiff need not offer proof of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature.

Title VII prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to "compensation, terms, conditions, or privileges of employment." [cits.] The former. Fifth Circuit has held that "terms, conditions, or privileges of employment" include the state of psychological well-being at the workplace.

*Rogers,* 454 F.2d at 238.

 Harassment based on sex includes "threatening, bellicose, demeaning, hostile or offensive conduct by a supervisor in the workplace because of the sex of the victim of such conduct." *Bell v. Crackin Good Bakers, Inc.,* 777 F.2d 1497, 1503 (11th Cir.1985). Viewing the totality of the circumstances in this case, the Court finds that the evidence, when construed in Plaintiffs' favor, is sufficient to sustain an action for a hostile work place.

### 4. Constructive Discharge Claims

 "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.' " *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997) (*quoting Thomas v. Dillard Dep't Stores, Inc.,* 116 F.3d 1432, 1433–34 (11th Cir. 1997), *cert. denied,* 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994)). "A constructive discharge claim will generally not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Management, Inc.,* 93 F.3d 752, 754 (11th Cir.1996). Citing *Kilgore* for this proposition, the Magistrate Judge recommended dismissal of Plaintiffs' claims, finding that each plaintiff

either failed to notify McDade of the comments and actions that made their work conditions intolerable or failed to give McDade sufficient time after notification to remedy the situation before resigning.

In *Kilgore* a delivery driver for a Pizza Hut restaurant allegedly sexually harassed three restaurant employees who sued the corporation that managed the restaurant for constructive discharge. *Id.* at 753. The *Kilgore* court dismissed the resulting sexual harassment claims upon finding that the plaintiffs failed to give the employer's personnel managers sufficient time to remedy the situation after providing notice of the delivery driver's actions. *Id.* at 754–55. These facts reveal the policy behind the *Kilgore* court's notice and time-for-remedy requirement: an employer cannot be held liable for constructive discharge unless the employer's personnel officials have been notified of the alleged acts and given the opportunity to remedy the situation.

■■■ This rule clearly does not apply to the facts in the case sub judice. The official in charge of personnel-McDade-is also the alleged troublemaker and there was certainly no need to notify him of his own actions.[2] Further, as noted in Part III.D.3.a. of this order, Defendant McDade was put on notice about his conduct.

In addition to that evidence, Defendant McDade received a complaint from employee Cathy Tatay about sexual harassment by Chief Assistant District Attorney Beau McClain which was occurring in the office. Defendant McDade reassigned Tatay to another attorney, which upset McClain. Defendant McDade then transferred Tatay back under McClain and commented that he was going to force Tatay to resign because she had complained about McClain. (Plaintiff Smith's Response to Int. No. 18).

Concerning Defendant McDade's complaint that none of the Plaintiffs utilized the grievance procedure under the office's sexual harassment policy nor complained outside the office, Plaintiff Smith reported Tatay's complaints to Gloria Turner, the Douglas County Personnel Director. (Smith Dep., pp. 380–81). Also, Plaintiff Hughes did complain about Defendant McDade to the court administrator and to a Douglas County superior court judge. However, she was told that her only recourse was to resign. Defendant McDade stated to his staff that any complaints about office matters which were made outside the office would be grounds for termination. (Plaintiff Hughes' Supp. Response to Int. No. 18).

■■■ The Magistrate Judge did not reach the issue of whether a reasonable juror could find that Plaintiffs' working conditions were so intolerable that a reasonable person in their positions would have been compelled to resign. Defendant McDade asserts that Plaintiffs cannot state a claim for constructive discharge because each resigned from her position for reasons unrelated to claims of sexual harassment. In fact, at the time each of the Plaintiffs left the District Attorney's office, none of them gave sexual harassment as her reason for leaving. However, in this action, Plaintiffs claim that they left because the sexual hostile environment was intolerable. The true reason each Plaintiff left the office is a question of fact to be decided by a jury. Viewing the evidence in a light most favorable to Plaintiffs, the Court finds that a reasonable juror could so find. The facts of this case are sufficiently analogous to *Cross* to create a fact issue as to whether Plaintiffs "involuntarily resign[ed] in order to escape intolerable and illegal employment requirements" created by Defendant

---

**2.** In dismissing the Title VII claims, the Court found that Defendant McDade's office was autonomous, and that he had total control over hiring, transfers, promotions, discipline, and discharges. It would be inconsistent to dismiss Plaintiffs' constructive discharge claims for failure to complain to someone other than Defendant McDade, especially when such other person would be powerless to help Plaintiffs.

McDade. *Cross,* 49 F.3d at 1507. Defendant's summary judgment motion is therefore denied with respect to Plaintiffs' claims for constructive discharge.

### 5. Plaintiff Gerstenberger's § 1983 Disparate Treatment Claim

Gerstenberger contends that McDade treated her less favorably than the male assistant district attorneys by: (1) assigning her less prestigious cases; (2) giving her a higher caseload; (3) granting her requests for leave at the last minute while granting male assistant district attorneys' requests in a timely fashion; (4) harshly criticizing her work in front of others while reserving criticism of male assistants for private conversation; (5) appointing male assistant district attorneys to state paid positions for which she had applied; and (6) appointing a male assistant district attorney to the position of chief assistant instead of her.

■ Gerstenberger's failure to promote claims related to McDade's refusal to appoint her to the state-paid positions or the chief assistant position are barred because the undisputed evidence reveals that these events occurred more than two years before Plaintiffs filed the Complaint.[3] Gerstenberger concedes in her response brief that O.C.G.A. § 9–3–33 prohibits her from recovering money damages for these claims, but argues that prospective injunctive relief is appropriate nonetheless under the twenty-year statute of limitations period found in O.C.G.A. § 9–3–22. However, for over thirteen years it has been clear that the two year personal injury statute of limitations found in § 9–3–33 governs all § 1983 claims filed in Georgia regardless of the type of relief sought. *Williams v. City of Atlanta,* 794 F.2d 624, 626 (11th Cir.1986). Therefore, the Court will proceed with the disparate treatment analysis by only considering the first four alleged discriminatory acts.

The ultimate issue in a § 1983 disparate treatment case, like Title VII cases, is whether "color, religion, sex, or national origin was a motivating factor for any employment practice." 42 U.S .C. § 2000e–2m (1994). The prohibited motivating factor can be established by either direct or circumstantial evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Considered in a light most favorable to Plaintiff Gerstenberger, there is some direct evidence that sex was a motivating factor in McDade's decisions regarding caseload. Though Plaintiff Gerstenberger did not wish to handle domestic violence cases, almost all of such cases except those involving murder were assigned to her. Defendant McDade stated domestic violence was "a woman's problem and [Gerstenberger] was a woman, so [she] could handle it." (Gerstenberger, Dep. p. 3) (Gerstenberger, Response to Interrogatories). Even in the absence of any direct evidence of discriminatory intent, Gerstenberger's claim would survive summary judgment if circumstantial evidence is presented that satisfies the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In circumstantial evidence cases, the plaintiff has the initial burden of establishing a prima facie case; this prima facie case gives rise to a presumption of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Trotter,* 91 F.3d at 1455. Once the plaintiff meets this burden, the defendant has an intermediate burden of producing a legitimate, nondiscriminatory reason for the challenged action. *Trotter,* 91 F.3d at 1455. If a defendant succeeds in carrying this burden, the presumption of discrimination disappears and the plain-

---

3. McDade also claims that the statute of limitations bars Gerstenberger's claim that she had a higher caseload because she testified that this occurred in 1993. This is, however, a misinterpretation of Gerstenberger's testimony; she testified that her caseload began to increase beyond that of her male counterparts in 1993, not that this was the first and only year that this occurred. (Gerstenberger Dep. at 98–99.)

tiff must show "by a preponderance of the evidence that the reasons offered by the defendant are a mere pretext for discrimination, and to persuade the factfinder that the defendant intentionally discriminated against the plaintiff." *Id.; McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.

a. *Gerstenberger's Prima Facie Case*

Because Gerstenberger's claim arises solely out of allegations that McDade treated male assistant district attorneys more favorably, the prima facie elements utilized by the Eleventh Circuit in *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) apply. To establish a prima facie case of disparate treatment, Gerstenberger must show that: (1) she is a member of a protected class under Title VII; (2) she was subjected to an adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Id.* Gerstenberger has presented evidence that, when viewed in a light most favorable to her, satisfies these prima facie elements. First, it is clear that elements one and four are satisfied; Gerstenberger is a member of a protected class and she was qualified for the position of assistant district attorney. The third element is satisfied as well; Gerstenberger has presented evidence that, if believed by the trier of fact, would prove that McDade treated similarly situated male assistant district attorneys more favorably than Gerstenberger.

McDade argues that Gerstenberger cannot satisfy the second element of her prima facie case because the allegations of less favorable treatment, even if believed, do not support a finding that Gerstenberger was the victim of an adverse job action. Citing the Fifth Circuit's opinion in

*Dollis v. Rubin,* 77 F.3d 777, 781–82 (1995), the Magistrate Judge agreed with McDade and concluded that less attractive case assignments, a higher caseload, more severe and public criticism, and intentional delays for approval of leave time "do not constitute adverse employment actions" and do not "even constitute[ ] a step toward an adverse job action." The Court declines to adopt this conclusion.

■■■■ An employee does not have to be the victim of an ultimate employment decision such as a wrongful termination or a discriminatory promotion to be the victim of an unlawful adverse employment action. Title VII not only prohibits employers from failing or refusing to hire or discharging an individual based on a protected characteristic, but it also prohibits employers from otherwise discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment...." 42 U.S.C. § 2000e–2(a) (1994). Gerstenberger's allegations of discriminatory conduct by McDade that affected the terms and conditions of her employment fall squarely within the latter category of unlawful employment practices. Last year, the Eleventh Circuit addressed this issue in the context of a Title VII retaliation claim and held that the term adverse employment action encompasses "adverse actions which fall short of ultimate employment decisions." *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (1998). In doing so, the court expressly disagreed with the Fifth Circuit cases relied upon by the Magistrate Judge and cited with approval cases that list disadvantageous job assignments and unwarranted criticisms as two examples of conduct that constitute adverse employment actions.[4] *Id.* This Court finds

---

4. *See also Edwards v. State of Conn., Dept. of Transp.,* 18 F.Supp.2d 168, 174 (D.Conn. 1998) (finding that plaintiff employee satisfied prima facie elements of Title VII race and sex discrimination claims where she testified that "she, along with other minorities, were given the less desirable work assignments than sim-

ilarly situated non-minority co-workers."); *Querry v. Messar,* 14 F.Supp.2d 437, 448 (S.D.N.Y.1998) (concluding that plaintiff employee in Title VII sex discrimination suit "submitted evidence that she suffered adverse employment actions" by showing she was

that McDade's alleged actions meet the "threshold level of substantiality that must be met for unlawful discrimination to be cognizable...." *Id.*

### b. Legitimate, Nondiscriminatory Reasons

To satisfy his burden concerning a legitimate nondiscriminatory reason, Defendant does not have to "persuade the court that [he] was actually motivated by the proffered reasons" but, instead, must simply "raise a genuine issue of fact as to whether [he] discriminated against the plaintiff." *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). McDade only responded to Gerstenberger's allegation that he assigned her less prestigious cases and a higher caseload. In an effort to distance himself from his office's process of assigning cases, McDade points out that Plaintiff Lewis was primarily responsible for assigning cases to the assistant district attorneys and that she made a good faith effort to ensure that each assistant had equal caseloads.[5]

### c. Showing of Pretext

At the summary judgment stage, Gerstenberger must "cast sufficient doubt on [Defendant's] proffered legitimate, nondiscriminatory reasons to permit a reasonable fact finder to conclude that [these] reasons 'were not what actually motivated its conduct.'" *Tidwell v. Carter Prods.,* 135 F.3d 1422, 1427 (11th Cir.1998) (*quoting Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994)). *See also Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 921 (11th Cir.1993) ("[P]laintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, when taken in the light most favorable to the non-moving

party, that could allow a jury to find by a preponderance of evidence that the plaintiff has established pretext...."). This may be done either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998) (*quoting Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

■ Gerstenberger responds with evidence that directly connects McDade to the type and number of cases assigned to Gerstenberger. With regard to the number of cases assigned to Gerstenberger, Lewis testified that Gerstenberger had the highest caseload in the office and that she asked McDade for permission to withhold assignments to Gerstenberger for a while to lighten her caseload; McDade allegedly instructed her to "go ahead and continue" assigning Gerstenberger cases in the usual manner. (Lewis Dep., pp. 33–34.) Gerstenberger has also presented evidence that McDade controlled the type of cases assigned to Gerstenberger. According to Gerstenberger's testimony, she worked on all domestic violence cases except those involving a murder, even though she had no interest in these cases. When Gerstenberger informed McDade of her desire to work on other types of cases as well, he allegedly informed her that domestic violence cases were "a woman's problem" and that because she was a woman, she could handle them. (Gerstenberger Dep., p. 31.) On another occasion, Gerstenberger allegedly asked McDade to assign her a murder case; McDade allegedly responded by ex-

forced to work while injured, denied leave and benefits, and assigned to midnight shifts).

5. With regard to the claim that McDade delayed granting Gerstenberger's leave requests, McDade responds only by stating that he al-

ways granted Gerstenberger's requests. But McDade never denies the allegation that he waited until the last minute to grant her requests while granting male assistant district attorneys' requests in a timely fashion.

plaining that "they were stressful, that they would cause stress to [Gerstenberger], and that [she] had a family ... and that he didn't think [she] really wanted that stress." (Gerstenberger Dep., p. 109.)

For all of these reasons, Gerstenberger is entitled to a trial on the merits with regard to her disparate treatment claim.

### 6. Plaintiff Heath's § 1983 Discriminatory Termination Claim

The parties agree that Plaintiff Heath, a female, is a member of a protected class, that she was qualified for the position of investigator, and that she suffered an adverse employment action when she was terminated. She was replaced by a male. Consequently, the Magistrate Judge found that Plaintiff Heath made out a prima facie case of disparate treatment in termination.

Defendant McDade asserts that Plaintiff Heath was terminated for insubordination, a legitimate nondiscriminatory reason. To show pretext, Plaintiff Heath offers evidence that Defendant McDade was looking to terminate her employment, that Defendant McDade placed her in an assignment she could not perform, and that Plaintiff Heath had been threatened with physical harm. Finding a jury issue, the Magistrate Judge recommended denial of summary judgment on this claim.

Defendant McDade objects to the Magistrate Judge's finding of a fact issue on pretext. Defendant McDade contends that he was only required to proffer a legitimate nondiscriminatory reason for the termination in order to prevail on his motion for summary judgment. Defendant McDade argues that the Magistrate Judge erred in requiring him to prove, rather than simply proffer that reason.

> Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

The effect of the presumption of discrimination created by establishment of the prima facie case is to shift to the employer the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action. To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."

If a defendant carries it burden of producing legitimate, nondiscriminatory reasons for its decision, the presumption of discrimination created by the McDonnell Douglas framework "drops from the case," and "the factual inquiry proceeds to a new level of specificity." However, elimination of the presumption does "not imply that the trier of fact no longer may consider evidence previously introduced to establish a prima facie case." As the Supreme Court has explained:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced

evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.

*Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997) (citations, quotes, and footnotes omitted).

■ The Court finds that the evidence presented to establish Plaintiff Heath's prima facie case, the evidence presented by the other Plaintiffs to establish their hostile work environment claims, and the evidence offered by Plaintiff Heath in response to the instant motion are sufficient to permit a reasonable factfinder to conclude that the reason given by Defendant McDade was not the real reason for his termination of Plaintiff Heath's employment. Therefore, Defendant McDade is not entitled to summary judgment on Plaintiff Heath's claims.

## IV. CONCLUSION

Defendant McDade's Motion for Summary Judgment [84–1] is **GRANTED, in part,** and **DENIED, in part.** Summary judgment is **GRANTED** as to the following:

a) All Title VII claims of all Plaintiffs;

b) § 1983 claims for damages against Defendant McDade, in his official capacity;

c) Plaintiff Heath's claims under the ADA and the Rehabilitation Act.

Summary judgment is **DENIED** as to the following:

a) § 1983 claims for prospective injunctive relief against Defendant McDade, in his official capacity;

b) Claims of all Plaintiffs, except Heath, for damages under § 1983 against Defendant McDade, in his individual capacity, based upon hostile work environment and constructive discharge;

c) Claims of Plaintiff Gerstenberger for damages under § 1983 against Defendant McDade, in his individual capacity, based upon disparate treatment;

d) Claims of Plaintiff Heath for damages under § 1983 against Defendant McDade, in his individual capacity, based upon unlawful termination.

**SO ORDERED.**